[No. 18011.  Department One.  January 17, 1924.]

## FRED W. AUST, *Respondent,* v. JOHN MATSON, *Appellant.*[1]

BOUNDARIES (14)—AGREED LOCATION—KNOWLEDGE OF GRANTEES—EVIDENCE—SUFFICIENCY. The mere placing of stakes at the supposed corners of a platted block is not an adoption of boundary lines that will be binding upon successors in interest, in the absence of any agreement fixing thereon, or notice thereof.

VENDOR AND PURCHASER (63, 79)—RESCISSION BY PURCHASER—DEFECT IN TITLE—MARKETABLE TITLE. Where the boundaries of a tract were erroneously pointed out to include a garage, when the true line cut off six feet of the building, the vendee, on discovering the error, is entitled to a rescission and return of the purchase money paid.

Appeal from a judgment of the superior court for King county, Ralston, J., entered October 24, 1922, in favor of the plaintiff, in an action for rescission, tried to the court. Affirmed.

*Shorett, McLaren & Shorett, Edward R. Taylor,* and *A. A. Booth,* for appellant.

*Cosgrove & Terhune,* for respondent.

PARKER, J.—The plaintiff, Aust, commenced this action in the superior court for King county, seeking a

[1]Reported in 222 Pac. 225.

decree confirming his claimed right to rescind a contract for the purchase of real property by him from the defendant, Matson, and awarding him recovery of the portion of the purchase price paid thereon, together with some items of expense incurred by him with reference to the property. A trial upon the merits resulted in a decree awarding to Aust relief as prayed for, from which Matson has appealed to this court. For convenience of expression we shall refer to Aust and Matson as if they were the only parties to the action, though their wives are also parties thereto.

On September 11, 1919, Aust entered into a written contract with Matson for the purchase from him of the South Twenty-four feet of Lot Nine (9) and the North Twenty-four feet of Lot Eight (8), Block One Hundred Twenty-four (124), Maynard's Lake Washington Addition to the City of Seattle.

The agreed purchase price was $2,500, of which $300 was then paid, the balance to be paid at the rate of $25 per month, with interest; a good and sufficient deed of conveyance to be executed by Matson to Aust upon full payment of the purchase price. Aust immediately went into possession of the property under the terms of the contract, and thereafter continued to occupy the same as the residence of himself and family and to timely make payments of the monthly installments upon the balance of the purchase price until March, 1922; when, as he claims, having discovered that Matson had erroneously, and in a legal sense fraudulently, pointed out to him the south boundary line of the premises, he commenced this action, at the same time tendering to Matson a quitclaim deed for the premises, describing the same as described in the contract. At the time of the making of the contract, the premises pointed out by Matson and manifestly intended to be sold by him and

purchased by Aust, consisted of a tract of land 120 feet long, east and west, and 48 feet wide, north and south, on which there were improvements consisting of a dwelling house, a garage to the south thereof, and a driveway along the south side of the house into the garage; the south side of which garage is about five inches north of the south line of the tract as pointed out.

The controversy is over the location of the south line of the tract as described in the contract, Matson insisting that as so described it is about five inches south of the garage, as pointed out by him at the time of the making of the contract; and Aust insisting, as discovered since the making of the contract, that as so described the south line is about six feet to the north, passing very nearly through the center line of the garage and driveway. Matson does not own any of the land to the south of the land contracted to be sold to Aust, so it is apparent that, if the premises as described in the contract be bounded on the south by a line through the driveway and garage, Matson will not be able to make good conveyance of the whole of the premises pointed out by him, unless he acquires title to a sufficient amount of land to the south for that purpose, which he either cannot do or refuses to do, insisting that Aust is required to accept conveyance of the premises according to the description in the contract.

The official existence of Maynard's Lake Washington Addition to the city of Seattle is evidenced by a plat which was filed in the office of the auditor of King county on February 6, 1884. This plat purports to plat into lots, blocks and dedicated streets a large tract of land bounded on the easterly side by the shore line of Lake Washington, and on the north, west and south sides by government section or subdivisional section

lines. The only monuments mentioned in the description or dedication language endorsed upon or noted upon the plat are a stone monument at a quarter section corner on the west boundary of the plat, a stone monument at a sixteenth section corner at the southwest corner of the plat, and a stone monument at a sixteenth section corner on the south boundary of the plat. The lots, other than the fractional ones along the lake shore, are stated in the description and dedication language endorsed upon the plat to be 60 by 120 feet in area, and the streets to be 70 feet wide. There are no figures on the plat itself indicating the size of the blocks or lots or the width of the streets. The full blocks purport to have twelve lots in each of them, numbered one to six southerly facing the streets to the west, and numbered seven to twelve northerly facing the streets to the east. There was no survey of the lots, blocks or streets, or fixing of their location upon the ground prior to or at the time of the filing of the plat. In other words, it is a mere paper plat with reference to government section subdivisions, in so far as the fixing of its location upon the ground is concerned.

When the plat was filed, the land it purported to cover was outside the city limits of Seattle. In 1909, the addition was taken into the city limits. Soon thereafter the city engineer, with a view to fixing upon the ground the location of the streets, made a careful survey of the whole of the addition according to the plat as nearly as could be done from the data thereon. This survey disclosed that there was not sufficient land within the description endorsed upon the plat to include all of the lots and blocks and the width of the streets, measured north and south. This shortage was by the city engineer apportioned and deducted accordingly from the lots and blocks, measured north and south, and per-

manent monuments placed at the center of the street intersections so found. This resulted in each full block being shortened some 2.56 feet and each lot being narrowed accordingly. We think the record before us calls for the conclusion that this survey was correctly made, and the center of all the street intersections accordingly correctly determined and marked upon the ground by appropriate permanent monuments.

ᵥ About the time the land was taken into the city, one Sturgis and one McCloy became the owners of all of block 124 of the addition. It is claimed that, at that time, there were old stakes marking the location of the corners of the lots in block 124. There is no evidence whatever as to who placed these stakes there. In any event, there is not the slightest ground for regarding these stakes as being placed there by or at the instance of the original platters of the addition. We have seen that the recorded official plat makes no mention of any survey of the blocks, lots or streets, or the placing or adoption of any monuments by the original platters fixing their location upon the ground, other than the above mentioned monuments on the west and south outer boundaries of the plat.

About 1912, Sturgis and McCloy concluded that they would, for the purpose of sale, divide lots 7, 8, 9 and 10, of block 124, owned by them, into tracts each 48 feet wide, thus making five such tracts out of the four platted lots. Sturgis says in his testimony, in substance, that McCloy placed stakes at the corners of these 48-foot tracts, doing so with reference to the old stakes which were assumed to mark the location upon the ground of the platted 60-foot lots. McCloy did not testify at the trial and we have no other testimony than that of Sturgis tending to show that the placing of those stakes by McCloy became, in effect, an agreed lo-

cation of the boundary lines of the five 48-foot tracts. Thereafter Sturgis took title to the 48-foot tract here in question, and McCloy took title to the 48-foot tract adjoining it upon the south. This seems to have been done by an exchange of deeds between them. We do not have these conveyances before us, but we think the record warrants the conclusion that, by the description therein, each took conveyances, upon their face, solely with reference to the 60-foot lot lines according to the official plat, and without any reference to any stakes purporting to mark the boundary lines of the lots or tracts. In other words, each took conveyance by description as in the contract here in question. There-after, in 1916, Sturgis built the dwelling house upon his 48-foot tract, concededly north of the south boundary thereof, whether viewed with reference to the officially platted 60-foot lots or with reference to the claimed agreed south boundary line of his 48-foot tract.

In 1917, Sturgis sold and conveyed his 48-foot tract to Matson, describing it, we are warranted in assuming, as in the contract here in question, that is, without reference to the 48-foot tract stakes. Thereafter appellant constructed south of the dwelling house the garage and driveway in question, the south line of the garage being located about five inches north of the line claimed to have been agreed upon by Sturgis and Mc-Cloy as the line between their two 48-foot tracts. This resulted in the garage and driveway encroaching upon McCloy's 48-foot tract to the south to the extent of about six feet, viewing the conveyance descriptions solely with reference to the 60-foot lot lines of the official plat, and assuming, as we do, that the city survey correctly demonstrated the location upon the ground of the officially platted 60-foot lots. In 1919, Matson contracted to sell to Aust the 48-foot tract, both parties

supposing it to include the garage and driveway, as well as the dwelling house; Matson then pointing out to Aust the south line thereof as being about five inches south of the garage. This is the contract here in question. Aust went into possession of the premises, assuming that such was its true location upon the ground, so being informed by Matson and relying solely upon such information, having then no reason to suspect otherwise.

In the fall of 1921, Aust first discovered that the description of the premises in his contract of purchase, which, as we have seen, was solely with reference to the officially platted 60-foot lots, was probably erroneous as not including a strip about six feet in width lying immediately north of a line about five inches south of the garage which had been pointed out to him by Matson as the south boundary line. Aust then caused an accurate survey to be made with reference to the city's survey and the monuments thereof placed by the city at the center of the street intersections, whereby it was demonstrated that the south line of the 48-foot tract described in his contract of purchase had been erroneously pointed out by Matson, which line, as described in the contract with reference to the official plat, was found to be through the garage and driveway about six feet north of where it had been pointed out by Matson, thus leaving the garage and driveway encroaching upon land to the south not included in the description in the contract. The owner of the tract to the south, a grantee of McCloy, claims the north boundary of that tract to the line running approximately through the center of the garage and driveway. Aust gave Matson to understand that he would expect him to make good his title to this strip of land, to the end that a good and sufficient conveyance thereof be made upon full payment of the purchase price of the contract.

Matson gave Aust to understand that he would not further perfect his title to that strip, insisting that he was under no obligation other than to make conveyance according to the description in the contract. Soon thereafter this action was commenced, followed by judgment in favor of Aust as above noticed.

The principal contention here made in behalf of Matson is that the placing of the stakes by McCloy purporting to mark the boundary lines of the 48-foot tracts, acquiesced in by Sturgis, was, in legal effect, an agreed, practical location of the boundaries of those tracts, binding not only upon them but also upon their grantees; and that not only the exchanged conveyances between themselves describing the tracts solely with reference to the officially platted 60-foot lot lines, but also all subsequent conveyances made by their grantees describing any of those tracts in the same language, must be held to mean such tracts as staked upon the ground by McCloy. Counsel for Matson rely upon a number of decisions touching the question of the binding effect of adopted boundary lines by a common grantor upon his grantees, and of agreed boundary lines by adjoining owners upon their grantees.

It may be conceded that such adoption or agreement fixing boundary lines, when evidenced in such manner as to give notice thereof to subsequent grantees, will, as a general rule, bind grantees of the parties so adopting or agreeing; but manifestly it will not do to hold grantees or successors in interest bound by any such adoption or agreement when they have no certain knowledge, actual or constructive, of such adoption or agreement. Now, in this case we have no written evidence whatever, not even unofficial written evidence, much less official record evidence, of any agreement between Sturgis and McCloy as to where upon the ground the boundary lines of these 48-foot tracts are with ref-

erence to the boundary lines of the officially platted 60-foot lots. We have only the testimony of Sturgis as to McCloy's placing stakes to make such boundary lines and his acquiescence therein. Just how any grantee of either of them, or any successor in interest through them, would know that these stakes were to evidence an agreement between Sturgis and McCloy as fixing the boundary lines of those tracts for the purpose of conveyance solely with reference to the lines of the officially platted 60-foot lots, as all such conveyances manifestly were made and intended to be made, is indeed difficult to understand. None of the conveyances of any of these tracts, we are warranted in assuming, mentioned any such stakes; but each of such conveyances described the tract solely with reference to the officially platted 60-foot lot lines.

In view of these considerations, it may well be asked what assurance has Aust that a conveyance to him describing the premises as in the contract will give him good title to the 6-foot strip of land lying immediately north of a line 5 inches south of the garage. The answer manifestly is, in the light of this record, that he has no such assurance with any degree of certainty. The grantee of McCloy owning the tract immediately to the south may be able to show even by McCloy's testimony that there were no stakes set with a view of marking on the ground with any degree of accuracy the lines of the tracts, and thus support the claim that the north line of his tract is in fact where it is theoretically found to be with reference to the city's survey, that is, a line running approximately through the center of the driveway and the garage which Aust in good faith believed he was purchasing as a part of the premises described in the contract. Now must Aust proceed with the consummation of his purchase contract by

continuing to pay the remaining installments of the purchase price, aggregating some $1,500 or more, and take the chance of a conveyance from Matson describing the property as in the contract, giving him good title to the 6-foot strip lying immediately north of a line 5 inches south of the garage? We think not.

This is not an action seeking damages for a breach of a warranty of title in a completely executed conveyance. If it were, there might be some possible reason for counsel for Matson arguing, as they do, that Aust should not be permitted to rescind and recover as prayed for because he has not yet been injured or disturbed in the possession and enjoyment of the property he has contracted to purchase. In its last analysis, our problem is reduced to this: Is the title which Matson offers to Aust upon the completion of the purchase price a marketable title. It seems clear to us that it is not, and that Matson avowedly cannot or will not make it so. It may be that, should Aust proceed and make full payment of the purchase price and receive a deed from Matson describing the property as in the contract, Aust might possibly, at the end of a lawsuit, be adjudged to have title to the six-foot strip superior to the claim of the grantee of McCloy as owner of the adjoining tract to the south; but, as advised by this record, we think such a result highly improbable. This uncertainty, if it be nothing more, touching Matson's title to the six-foot strip, is of itself enough to call for the affirmance of the decree rendered by the trial court. Some other contentions are made and presented to us, practically without argument. We feel warranted in disposing of them in an equally summary manner by saying that we think they are wholly without merit.

The decree of the trial court is affirmed.

MAIN, C. J., HOLCOMB, TOLMAN, and MACKINTOSH, JJ., concur.