**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| DENNIS SEVERSON, a single person and KENNETH D. UPHOFF and CHRISTINE S. BURNELL, husband and wife, | No. 45596-0-II |
| Respondents, | UNPUBLISHED OPINION |
| v. | |
| BRAD A. CLINEFELTER and SUZANNE CLINEFELTER, husband and wife, | |
| Appellants. | |

BJORGEN, A.C.J. — Brad and Suzanne Clinefelter appeal the trial court's judgment

quieting title to a strip of land in their neighbors, Dennis Severson, Kenneth D. Uphoff, and

Christine S. Burnell. The trial court concluded that Uphoff and Burnell (collectively Uphoff),

owners of one parcel, as well as Severson, owner of another, had adversely possessed the

disputed strip, which lies between their parcels and the Clinefelters' in a vacated street right-of-

way. The Clinefelters assign error to a number of the trial court's findings of fact and

conclusions of law, contending that (1) a 1983 stipulation by predecessors in interest to the

Clinefelters, Severson, and Uphoff, resolving litigation involving the same strip, precluded

Severson's[1] and Uphoff's claims and (2) the evidence does not establish adverse possession by

either Severson or Uphoff. Because we hold that (1) the 1983 stipulation is not binding on

---

[1] The Clinefelters contend in assignment of error 10 that the stipulation precludes both
Severson's and Uphoff's adverse possession claims, but with their reply brief state that they are
only arguing that Uphoff is bound by the stipulation. We follow the assignment of error and take
the Clinefelters to contend that both Severson's and Uphoff's claims are precluded by the
stipulation.

Severson or Uphoff and (2) the evidence establishes adverse possession by Severson and by Uphoff's predecessors, we affirm.

FACTS

The disputed strip of land in this appeal is located in the western half of a 50-foot wide former right-of-way platted in 1899 as "Swan Street," running north and south. We refer to the entire 50-foot wide former right-of-way as "Swan Street" and to its western half as the "disputed strip."[2] Clerk's Papers (CP) at 62-63. The Clinefelters' parcel lies to the west of Swan Street, directly across from Uphoff's and part of Severson's parcels, which lie to the east of Swan Street. The Uphoff parcel lies immediately south of Severson's.

A.     Severson's Property Interest

Severson bought his parcel in 1977 from Ted Thompson, who also had owned the future Clinefelter and Uphoff parcels. Severson testified that he and Thompson thought an old fence running down the west side of the former right-of-way was the boundary between Thompson's parcel, now the Clinefelters', and Swan Street, not necessarily the boundary of Severson's parcel.

After purchasing the property, Severson cleared most of Swan Street up to about two feet from the old fence along the west side of the former right-of-way, including most of the disputed strip. Severson also at times kept a boat in the disputed strip, although the record is not clear for how long. He also put in a driveway on the eastern, undisputed half of Swan Street side to provide access to the Uphoff's parcel. Severson kept the entire Swan Street area, including the

---

[2] Swan Street was vacated five years after it was platted by operation of the nonuse provision of the Road Laws of 1890, Laws of 1889-90, chapter 14, section 32, at 603. *See Real Progress, Inc. v. City of Seattle*, 91 Wn. App. 833, 837-39, 963 P.2d 890 (1998) (discussing the application of the nonuse provision to platted streets in unincorporated areas).

disputed strip, mowed almost up to the old fence, except for a 50-foot diameter semicircular berm around a large fir tree, mostly on the west side of the street but extending past the Swan Street center line, that he "left untouched." 1 Verbatim Report of Proceedings (VRP) at 93-95.

B.    Uphoff's Property Interest

Uphoff bought their parcel, immediately south of Severson's, in December 2003, and moved onto it a few months later. As noted, Severson had regularly mowed and maintained the portion of Swan Street adjacent to Uphoff's parcel up to the old fence, including most of the disputed strip. Uphoff took over the mowing and maintenance from Severson, and at some point planted a garden very close to the old fence. Kenneth Uphoff testified that he believed he and Burnell owned the adjacent portion of Swan Street up to the old fence, but admitted that, once he learned about it, he did not actually know where Swan Street was and that it "was a question in [his] mind." 1 VRP at 220-22.

After Uphoff moved onto his parcel, Clinefelters built a gate in the old fence across from Uphoff's parcel, near the garden. Kenneth Uphoff testified that, before building the gate, Brad Clinefelter asked him for permission to do so, and Uphoff replied, "Yeah, no problem." 1 VRP at 183. Brad Clinefelter testified that he and his wife decided to put in the gate in order to access the Uphoff's property, as well as to get to the public road via Swan Street, and denied having asked Uphoff's permission.

Shortly before this litigation began, Uphoff had Brad Clinefelter build a chicken coop slightly east of the old fence, in the disputed strip. The chicken coop was designed, per Uphoff's instructions, so it would not be a permanent fixture. After this dispute arose, but prior to trial, Severson and Uphoff moved the chicken coop east, toward the Uphoff parcel and out of the disputed area.

3

C.      Clinefelters' Property Interest

The Clinefelters bought their parcel in 2000. They generally accessed their property from the portion of Nolton Road that runs along the west edge of their parcel, before it turns east and runs along the north edge of their parcel. Brad Clinefelter testified that he and his wife sometimes walked on Swan Street to access the portion of Nolton Road that runs north of their parcel.

Shortly after buying the property, the Clinefelters repaired the dilapidated barbed wire fence running along the eastern part of their parcel and the western edge of Swan Street. Severson testified at trial that Thompson, who continued to own the Clinefelters' parcel for many years after Severson bought his parcel, "always said that . . . the fence was the boundary line." 1 VRP at 41.

D.      The 1983 Stipulation

As a result of the chicken coop events, Uphoff began researching Swan Street and discovered that in 1983, the Thompson estate, which then still owned the Clinefelters' parcel, sued James and Florence Hubbard, predecessors in interest to Uphoff's parcel, regarding the portion of Swan Street between the two parcels. Those parties resolved the dispute by stipulation, which provided in relevant part:

> 4.      As a result of the vacation of Swan Street both the plaintiff and defendants are owners of the one-half of Swan Street abutting their respective properties.
> 5.      Both plaintiff and defendants each grant to the other a permanent easement for drainage, ingress, egress and utilities over, across and under that portion of Swan Street owned by each party.
> 6.      Both parties agree that the roadway presently in existence on a portion of Swan Street shall remain in its present location but any future utilities shall be put in on the side of the roadway owned by the party obtaining the utilities and that any roads constructed in the future shall be constructed down the center line of Swan Street and an equal distance on each side of the center line.
> 7.      The parties agree that neither shall use the other parties' half of vacated Swan Street or the open part of Swan Street for parking or storage or in any other

4

manner not reasonably related to the exercise of the parties' rights to drainage, ingress, egress and utilities.

CP at 9-10. The executor of the Thompson estate, the Hubbards, and the Jefferson County prosecuting attorney signed the stipulation, which purports to "be binding upon the heirs, successors and assigns of the parties hereto." CP at 10. It was never recorded or reduced to a judgment. In 1985, the Jefferson County Superior Court dismissed the lawsuit on the court clerk's motion, for want of prosecution.

The Clinefelters first learned of the stipulation when Uphoff gave them a copy of it. Severson, Florence Hubbard's brother-in-law, knew about the lawsuit and resulting stipulation all along, but did not tell Uphoff or the Clinefelters.

In early 2011, the Clinefelters hired licensed professional surveyor Eric Olson, an acquaintance of Brad Clinefelter's, to survey their parcel. Olson's survey located the center line of Swan Street about 17 feet east of the old fence, which was about 6.5 feet east of where Severson believed it to be. Thus, according to the Olson survey, Uphoff's garden was on the Clinefelters' side of Swan Street, in the disputed strip.

Shortly after Severson and Uphoff learned where Olson had located Swan Street, they filed this lawsuit, seeking to quiet title to the west half of Swan Street, up to the old fence, in each adjacent to their respective real properties. The complaint stated causes of action for adverse possession, based on use of the disputed strip by Severson, Uphoff, and Uphoff's predecessors in interest.[3]

---

[3] The complaint also included a breach of contract claim based on the 1983 stipulation, but Severson and Uphoff abandoned that claim prior to trial.

E.    Trial

At trial, in addition to the facts described above, witnesses testified to the use of Swan Street by previous owners of the Uphoff and Clinefelter parcels. Florence Hubbard testified that she purchased Uphoff's parcel in 1977. She also testified that she built a greenhouse in the disputed area in 1983, but removed it a few years later in 1985 or 1986. In addition to a greenhouse, she kept a small garden all the time that she was there. The garden and the greenhouse were on Swan Street about 3 to 10 feet from the old fence. She testified further that, although there was no gate in the old fence, Thompson sometimes came over it into Swan Street. She sold her property to Douglas Kronquist in 1990.

Hubbard testified that Kronquist used the property "as a garbage dump" and "let the garden go." 1 VRP at 123. According to Hubbard, Kronquist did not store anything in Swan Street, except possibly his car, but used it for ingress and egress. Hubbard testified that, in 1992, when Paul and Elaine Myers bought the parcel, there was nothing in the disputed area, which was open and cleared. The Meyers also used Swan Street for ingress and egress, but Hubbard did not know if they maintained a garden or anything else in the disputed area. The Myers sold the parcel to Uphoff in 2003. Severson's recollection largely agreed with Hubbard's, but Severson also testified that Kronquist maintained the Hubbards' garden "[s]omewhat," 1 VRP at 26-30, and that the Myers kept up the garden.

Uphoff testified that when they bought the property in 2003, there was a garden in the corner of the disputed strip and an 18-foot trailer also in the disputed area. Uphoff also testified that there was a water trough that had always been there "next to the old fence" in the disputed strip. 1 VRP at 178.

6

Severson and Uphoff vigorously disputed the accuracy of the Olson survey, suggesting that Olson deliberately skewed the result to benefit the Clinefelters and that the proper center line of Swan Street lay about six-and-a-half feet west of Olson's markers. They called an expert who criticized the methods Olson employed.

The trial court ruled in favor of Severson and Uphoff, and entered the following findings regarding the old fence and the uses made up to it in the disputed strip:

> 7.  It is clear from the testimony that Ted Thompson fenced what is now the Clinefelter property sometime prior to 1977, including a fence in platted Swan Street, between the Plaintiffs' and Defendants' properties.
>
> 8.  It is also clear that as between Plaintiff Dennis Severson and Ted Thompson, the fence in platted Swan Street was recognized by both as the common boundary between their properties. Mr. Severson exclusively occupied that portion of platted Swan Street up to the fence, including using it as a lawn and parking vehicles there, while the Thompson property on the other side of the fence was generally un-maintained.
>
> 9.  Florence Hubbard testified that when Ted Thompson sold the current Uphoff/Burnell property to her in 1977, she treated the old fence in platted Swan Street as the common boundary between her property and Ted Thompson's property, including building a greenhouse and installing a garden adjacent to the fence.

CP at 63. The court did not explicitly make a credibility determination, but apparently believed Uphoff's testimony that the Clinefelters asked permission to build the gate in the old fence and did not believe the Clinefelters' contrary testimony:

> The act of Brad Clinefelter, upon taking possession of Defendants' present property, of asking permission of Plaintiffs Uphoff and Burnell to install a gate in the old fence, to access their side of the disputed property, evidenced recognition of those Defendant's non-permissive occupation of that disputed area.

CP at 67 (conclusion of law 9).

The trial court also found that

> [i]n 1990 Florence Hubbard sold her property to Kronquist, who sold to Myers in 1992, who sold to Uphoff/Burnell in 2003. [Exh. 5, 6 and 7]. Dennis Severson testified that during this period the area up to the fence, in the West half

7

of vacated Swan Street, was exclusively used in various ways that included a garden, parking of vehicles, and a mobile home owned by Kronquist, and was maintained to a greater or lesser degree by Kronquist, Myers and Uphoff and Burnell.

CP at 64 (finding of fact 13). The court also found that "[t]here is no testimony or evidence that the Thompson estate or the Clinefelters attempted to use any portion of vacated Swan Street for ingress, egress, or drainage." CP at 64 (finding of fact 14).

The court also made the following dispositive conclusions:

6.      Plaintiff Severson had for more than ten years prior to litigation herein, from 1977 to 2011, by occupying, maintaining by mowing as a lawn up to the fence, storing and parking vehicles, grading and maintaining a driveway that only Plaintiffs used, and otherwise exercised open and notorious, actual and uninterrupted, exclusive to the rights of the true owner, and without recognition of superior title by another or by permission, adverse possession of that portion of vacated Swan Street between the centerline adjacent to his property and the old fence, which portion is indisputably within the fee to which title has been held by the Defendants Clinefelter and their predecessors since 1977.

7.      By a preponderance of the evidence, Plaintiffs Uphoff and Burnell had, for more than ten years prior to litigation herein, from 1977 to 2011, by tacking to the uses and occupations of their predecessors Hubbard, Kronquist and Myers by installing and maintaining gardens, a greenhouse, chicken coops, grading and maintaining a driveway which only they used, parked vehicles and other indicia of ownership, exercised open and notorious, actual and uninterrupted, exclusive to the rights of the true owner, and without recognition of superior title by anther or by permission, adverse possession of that portion of vacated Swan Street between the centerline adjacent to their property and the old fence, which portion is indisputably within the fee to which title has been held by the Defendants Clinefelter and their predecessors since 1977.

CP at 66 (emphasis omitted). Thus, with respect to Severson, the court relied on his installation of the driveway, storing of vehicles, and mowing to establish the adverse possession, and with respect to Uphoff, on the uses of predecessors in interest starting with the Hubbards.

The trial court declined to rule on the accuracy of the Olson survey, finding it unnecessary to the resolution of the dispute. The trial court ruled that the 1983 stipulation did not bind the parties to this litigation. The court quieted title to the underlying fee of the disputed

8

strip, from Olson's center line to the old fence, in Severson and Uphoff "subject to the easement rights of ingress, egress and utilities remaining to Defendants as adjacent lot owners." CP at 67, 68-71. The Clinefelters appeal.

ANALYSIS

The Clinefelters contend that the trial court erred in declining to enforce the stipulation resulting from the 1983 lawsuit between the Hubbards and Thompson's estate, arguing that (1) it binds the present parties and (2) precludes Severson's and Uphoff's claims under the doctrine of res judicata. The Clinefelters also assign error to a number of the trial court's findings and contend that neither Uphoff nor Severson established adverse possession of the disputed strip. We disagree.

We first consider the effect of the 1983 litigation and the resulting stipulation. Concluding that the 1983 stipulation does not bind the present parties, we then turn to the Clinefelters' remaining challenges.

I. EFFECT OF THE 1983 STIPULATION

The Clinefelters argue both that the stipulation binds the parties as a contract and that because it concluded the 1983 lawsuit, it has a preclusive effect under the doctrine of res judicata. We address each contention in turn.

A.    The Stipulation Does Not Bind the Parties

The Clinefelters rely on precedent holding that stipulations affecting an interest in realty entered in open court bind the parties to them. *Snyder v. Tompkins*, 20 Wn. App. 167, 173, 579 P.2d 994 (1978). Our Supreme Court held long ago, however, that

> adoption or agreement fixing boundary lines, when evidenced in such manner as to give notice thereof to subsequent grantees, will, as a general rule, bind grantees of the parties so adopting or agreeing; but manifestly it will not do to hold grantees or

9

successors in interest bound by any such adoption or agreement when they have no certain knowledge, actual or constructive, of such adoption or agreement.

*Aust v. Matson*, 128 Wash. 114, 121, 222 P. 225 (1924). As Uphoff and Severson point out, the cases on which the Clinefelters rely involve attempts to enforce stipulations against the actual parties to those stipulations. The Clinefelters cite no case in which a court has enforced such a stipulation against someone not party to it.

Similarly well established is the more general rule that an agreement does not generally bind persons who are not party to it. *See Oltman v. Holland Am. Line USA, Inc.*, 163 Wn.2d 236, 249-50, 178 P.3d 981 (2008). It is undisputed that neither Severson nor any predecessor in interest to his parcel agreed to the stipulation. Thus, because neither Severson nor any predecessor was party to the 1983 stipulation, Severson is not bound by it.

The decision in *Chaplin v. Sanders*, 100 Wn.2d 853, 676 P.2d 431 (1984), also illuminates the reach of the 1983 stipulation. In *Chaplin*, the party claiming adverse possession had actual notice of a provision in a real estate contract conveying his parcel from one predecessor in interest to another, which recognized the true owner's superior title to the land at issue. *Chaplin*, 100 Wn.2d at 855-56. After holding that a claimant's "subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant" and overruling cases to the contrary, the court made clear that "the contractual provision is no longer relevant" and ultimately held that the claimant's actual uses established adverse possession. *Chaplin*, 100 Wn.2d at 861-62. Thus, even a party with actual notice that a predecessor in interest recognized another's superior title to disputed land may still adversely possess that land.

10

The parties to the 1983 litigation did not reduce the stipulation to a judgment or record it. Under the case law just described, the stipulation did not bind Uphoff, because they had no actual or constructive knowledge of it.

B.    The Stipulation Is Not Res Judicata

The Clinefelters also contend that, under the doctrine of res judicata, the stipulation ending the 1983 lawsuit should control the outcome here.  Uphoff and Severson counter that the Clinefelters waived any res judicata defense because they did not plead it in their answer and that the doctrine does not apply in any event.

Whether or not the Clinefelters' pleadings in the trial court adequately raised res judicata, the doctrine plainly does not apply to these circumstances.  "The threshold requirement of res judicata is a final judgment on the merits in the prior suit." *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 865, 93 P.3d 108 (2004).  The record reflects that the 1983 lawsuit was dismissed for want of prosecution under CR 41(b) on the court clerk's motion.  CP 11.  CR 41(b)(2)(A) specifies that such dismissals are without prejudice.  A dismissal without prejudice does not constitute a final judgment on the merits for purposes of res judicata.  *See Zarbell v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 52 Wn.2d 549, 554, 327 P.2d 436 (1958).  Therefore, there was no final judgment on the merits, and the resolution of the 1983 litigation by stipulation does not preclude this lawsuit.

II. ADVERSE POSSESSION

The Clinefelters raise different challenges to the trial court's ruling as to each of the neighboring parcels.  With respect to Uphoff, they assert that the evidence does not establish continuous use of the disputed strip for the required 10-year period.  As to Severson, the

Clinefelters assert that he failed to show that his use of the disputed strip was exclusive or hostile to their interests.

After setting out the standard of review and governing law, we address Uphoff's and Severson's arguments that the Clinefelters waived any challenge to the assignments of error. Holding that the Clinefelters did not waive their challenge, we consider whether the trial court's conclusions as to each respondent's parcel rest on findings supported by substantial evidence in the record. Concluding that substantial evidence in the record supports the relevant findings and that the findings support the conclusions of adverse possession, we affirm the trial court.

A.    Standard of Review

Adverse possession claims present mixed questions of law and fact: "'Whether the essential facts exist is for the trier of fact; but whether the facts, as found, constitute adverse possession is for the court to determine as a matter of law.'" *Chaplin*, 100 Wn.2d at 863 (quoting *Peeples v. Port of Bellingham*, 93 Wn.2d 766, 771, 613 P.2d 1128 (1980)). Thus, whether the facts properly found establish each particular element of an adverse possession claim raises a separate question of law that we review de novo. *See Petersen v. Port of Seattle*, 94 Wn.2d 479, 485, 618 P.2d 67 (1980). We presume that the holder of legal title has possession, and the party claiming adverse possession thus bears the burden of proving the necessary elements by a preponderance of the evidence. *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989); *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 50, 271 P.3d 973 (2012).

A party challenging a trial court's factual findings bears the burden of showing them incorrect. *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990). In that inquiry, we consider whether substantial evidence supports the findings and, if so,

whether those findings properly support the trial court's conclusions of law. *Harris*, 133 Wn. App. at 137. Substantial evidence supports a finding where the record, viewed in the light most favorable to the prevailing party, contains a quantity of evidence sufficient "to persuade a fair-minded, rational person" of its truth. *Harris*, 133 Wn. App. at 137. We treat unchallenged findings as verities. *Harris*, 133 Wn. App. at 137.

B.     Governing Law

When a platted street was vacated by operation of the former nonuser statute codified at Laws of 1889-90, chapter 19, section 32, at 603, until 1909, title to the underlying fee vested in the owners of the adjacent parcels from the edge of those parcels to the street's center line. *Turner v. Davisson*, 47 Wn.2d 375, 385-86, 287 P.2d 726 (1955); *Curtis v. Zuck*, 65 Wn. App. 377, 378-79, 829 P.2d 187 (1992); *Wells v. Miller*, 42 Wn. App. 94, 97-98, 708 P.2d 1223 (1985). Purchasers of parcels in the plat, however, retained a right to use the platted street for ingress and egress, which other purchasers and the grantor may not deny. *Burkhard v. Bowen*, 32 Wn.2d 613, 622-24, 203 P.2d 361 (1949); *Van Buren v. Trumbull*, 92 Wash. 691, 695-98, 159 P. 891 (1916); *Curtis*, 65 Wn. App. at 379. Nonetheless, title to the underlying fee acquired by vacation of such a street is "of such a nature that it could be lost by adverse possession." *Tamblin v. Crowley*, 99 Wash. 133, 139, 168 P. 982 (1917); *see also Wells*, 42 Wn. App. at 97-98.

In Washington, the common law and statutes of limitation govern adverse possession claims. *See Gorman v. City of Woodinville*, 175 Wn.2d 68, 76, 283 P.3d 1082 (2012) (Madsen, C.J., concurring). Here, the relevant statute provides that

> [f]or actions for the recovery of real property, or for the recovery of the possession thereof[,] . . . no action shall be maintained for such recovery unless it appears that the plaintiff, his or her ancestor, predecessor or grantor was seized or possessed of the premises in question within ten years before the commencement of the action.

RCW 4.16.020.

Thus, parties claiming property by adverse possession must generally prove that their possession of the disputed property was "(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile" to the interest of the holder of title for a period of 10 years. *ITT Rayonier*, 112 Wn.2d at 757; *Nickell*, 167 Wn. App. at 50. "Where there is privity between successive occupants holding continuously and adversely to the true title holder, the successive periods of occupation may be tacked to each other to compute the required 10-year period of adverse holding." *Roy v. Cunningham*, 46 Wn. App. 409, 413, 731 P.2d 526 (1986).

Generally, a claimant who shares the disputed property with the title owner cannot establish the first element of "exclusive" possession. *Crites v. Koch*, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987). Adverse possession claimants need not prove, however, that their possession was absolutely exclusive: "An 'occasional, transitory use by the true owner usually will not prevent adverse possession if the uses the adverse possessor permits are such as a true owner would permit a third person to do as a neighborly accommodation.'" *Lilly v. Lynch*, 88 Wn. App. 306, 313, 945 P.2d 727 (1997) (quoting 17 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE REAL ESTATE: PROPERTY LAW § 8.19, at 516 (1995)) (internal quotation marks omitted). Thus, "the possession must be of a type that would be expected of an owner under the circumstances." *Crites*, 49 Wn. App. at 174.

Similarly, the "actual and uninterrupted" element does not require claimants to show that they used the property constantly. "'Continuous and uninterrupted use' does not . . . require the neighbors to prove constant use[, but only] . . . 'use of the same character that a true owner might make of the property considering its nature and location.'" *Lee v. Lozier*, 88 Wn. App. 176, 185, 945 P.2d 214 (1997) (quoting *Double L. Props., Inc. v. Crandall*, 51 Wn. App. 149, 158, 751

14

P.2d 1208 (1988)). Seasonal use, for example, will suffice if owners of similar property typically use it only seasonally. *Lee*, 88 Wn. App. at 185-86.

To establish the open and notorious element, the claimant must show "either (1) that the title owner had actual notice of the adverse use throughout the statutory period or (2) that the claimant used the land such that any reasonable person would have thought he owned it." *Riley v. Andres*, 107 Wn. App. 391, 396, 27 P.3d 618 (2001). As with the other elements, in determining whether this requirement is met, a court must consider the claimant's conduct in light of the character of the property at issue: "The necessary use and occupancy need only be of the character that a true owner would assert in view of its nature and location." *Krona v. Brett*, 72 Wn.2d 535, 539, 433 P.2d 858 (1967) (emphasis omitted).

For purposes of the fourth element, hostility does not require animosity, but only "that the claimant possesses property in a manner not subordinate to the title of the true owner." *Teel v. Stading*, 155 Wn. App. 390, 395, 228 P.3d 1293 (2010). Our Supreme Court has held that courts apply an objective test to determine whether a claimant has established this element:

> The "hostility/claim of right" element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period. The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination.

*Chaplin*, 100 Wn.2d at 860-61. Nevertheless, "permission, express or implied, from the true owner negates the hostility element as a matter of law," unless the claimant shows "that the permission terminated and that the original owner had notice of the adverse use." *Teel*, 155 Wn. App. at 396.

15

C.       The Clinefelters' Challenge to the Trial Court's Factual Findings

Uphoff and Severson first argue that we should not consider the assignments of error to certain findings of fact because the Clinefelters did not (1) specifically object to the challenged findings when presented by the trial court or (2) reproduce the challenged findings verbatim in their brief. We address each contention in turn and reach the Clinefelters' assignments of error on their merits.

1. The Clinefelters' Failure to Object to the Findings in the Trial Court

Severson and Uphoff cite no authority demonstrating that one must formally object to findings at the trial court in order to challenge them on appeal. Instead, the relevant court rule provides that

> [f]ormal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and grounds therefore; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party.

CR 46. We have interpreted this rule such that "[a] party who clearly presents its factual and legal position at trial, but loses, does not waive error by cooperating when a trial court asks that its lawyer provide draft findings and conclusions that reflect the court's announced decision." *Gamboa v. Clark*, 180 Wn. App. 256, 266, 321 P.3d 1236 (2014), *aff'd*, 183 Wn.2d 38 (2015). This view has long prevailed in Washington. *See, e.g.*, *Harmon v. Gould*, 1 Wn.2d 1, 6, 94 P.2d 749 (1939) (similarly interpreting Rule XI of the former Rules of Practice).

The Clinefelters' evidence and argument at trial adequately informed the trial court of their objection to the findings made and the actions it took based on those findings. This preserved their challenge to the findings on appeal.

2. The Clinefelters' Failure to Set Out the Challenged Findings in Their Brief

Uphoff and Severson next invite us to decline to consider the assignments of error to the trial court's factual findings because the Clinefelters did not set forth the challenged findings verbatim in their brief. Although the Clinefelters attached the findings and conclusions to their notice of appeal, in their brief they merely identified the challenged findings by number and briefly explained their objections to each.

This argument relies on RAP 10.4(c), which provides that "a party [who] presents an issue which requires study of a . . . finding of fact, . . . should type the material portions of the text out verbatim or include them by copy in the text or in an appendix to the brief." The rules specify, however, that when a party fails to do something that the rules state the party "should do," the ordinary remedy is sanctions, not outright refusal to consider the claim on its merits. RAP 1.2(b). The rules provide ultimately that they "will be liberally interpreted to promote justice and facilitate the decision of cases on the merits." RAP 1.2(a).

Consistently with this approach, "[i]n appropriate circumstances," we will waive technical violations of the RAP 10 briefing requirements, especially where "the appellant's brief makes the nature of the challenge clear and includes the challenged findings in the text." *Harris v. Urell*, 133 Wn. App. 130, 137, 135 P.3d 530 (2006) (citing RAP 1.2(a)). Although, the Clinefelters did not include the challenged findings in their brief's text, they identified them by number, included them in their notice of appeal and in the record, and made the nature of the challenges perfectly clear. Consequently, we address the Clinefelters' assignments of error to the trial court's findings on the merits.

3. The Challenged Findings[4]

The Clinefelters assign error to several of the factual findings on which the trial court relied in ruling that Severson and Uphoff had adversely possessed the disputed strip. They challenge finding 8, which reads:

> It is also clear that as between Plaintiff Dennis Severson and Ted Thompson, the fence in platted Swan Street was recognized by both as the common boundary between their properties. Mr. Severson exclusively occupied that portion of platted Swan Street up to the fence, including using it as a lawn and parking vehicles there, while the Thompson property on the other side of the fence was generally un-maintained.

CP at 63. The Clinefelters assert that the evidence establishes that the old "fence in Swan Street was not the common boundary between Thompson and Severson" and that "Severson did not exclusively occupy Swan Street" up to the old fence. Br. of Appellant at 10.

The Clinefelters assign error to finding 9, which states:

> Florence Hubbard testified that when Ted Thompson sold the current Uphoff/Burnell property to her in 1977, she treated the old fence in platted Swan Street as the common boundary between her property and Ted Thompson's property, including building a greenhouse and installing a garden adjacent to the fence.

CP at 63. They assert that the Hubbards were uncertain where the old fence was and Florence Hubbard did not testify that she recognized the fence as the common boundary.

The Clinefelters also assign error to finding 13, which reads:

> In 1990 Florence Hubbard sold her property to Kronquist, who sold to Myers in 1992, who sold to Uphoff/Burnell in 2003. [Exh. 5, 6 and 7]. Dennis Severson testified that during this period the area up to the fence, in the West half of vacated Swan Street, was exclusively used in various ways that included a garden, parking of vehicles, and a mobile home owned by Kronquist, and was

---

[4] In addition to the findings discussed below, the Clinefelters also assign error to finding of fact 10, which concerns the events leading up to the 1983 litigation. However, the manner in which the 1983 lawsuit began has no bearing on the issues here, and the Clinefelters do not explain why they take issue with the trial court's findings on the matter.

18

maintained to a greater or lesser degree by Kronquist, Myers and Uphoff and Burnell.

CP 64. The Clinefelters assert that Severson "did not testify that the area was used exclusively by anyone; he also testified that he recognized it as a right of way." Br. of Appellant at 11.

The Clinefelters further assign error to finding 14, which reads:

> There is no testimony or evidence that the Thompson Estate or Clinefelters attempted to use any portion of vacated Swan Street for ingress, egress, or drainage. Nor have utilities been installed or otherwise altered from what existed at the time of the 1983 Stipulation.

CP at 64. The Clinefelters point out that they testified to occasionally using Swan Street for taking walks.

Substantial evidence supports the findings to the extent that Severson used the disputed strip as a lawn almost up to the old fence and at some time stored property in the form of a boat on it. 1 VRP at 44-45, 53, 93-96. Substantial evidence further shows that Severson mowed much of the disputed strip almost up to the old fence. 1 VRP at 93-96.

However, the assertion in finding 8 that "Mr. Severson exclusively occupied that portion of platted Swan Street up to the fence," and the assertion in finding 14 that "[t]here is no testimony or evidence that the Thompson Estate or Clinefelters attempted to use any portion of vacated Swan Street for ingress, egress, or drainage" are not supported by substantial evidence. CP at 62-63. The testimony established, and Severson admitted, that the Hubbards and other owners whose parcels further south abutted Swan Street to the east used the portion of Swan Street adjacent to Severson's parcel. 1 VRP at 73, 88, 126-28. The trial court also heard testimony that both Thompson and the Clinefelters occasionally used the disputed strip to access their property on foot. 1 VRP at 118, 2 VRP at 52. However, as shown in the analysis below,

this occasional use by neighbors does not prevent Severson from establishing the exclusivity needed for his adverse possession claim.

Substantial evidence also supports the finding that Florence Hubbard maintained a garden in the disputed strip. The evidence, set out above, shows that Florence Hubbard maintained the garden from 1977, when the Hubbards purchased their property, to 1990, when they sold it to Kronquist. 1 VRP at 109-11, 117, 120. Severson's testimony that Kronquist maintained the Florence Hubbard's garden "somewhat," 1 VRP at 26-30, and that the Myers kept up the garden is substantial enough to support the finding that the garden was maintained in the disputed strip up to Uphoff's purchase of the property. 1 VRP at 31.

D.    The Trial Court's Conclusions of Law

The Clinefelters assign error to many of the trial court's conclusions regarding Severson's and Uphoff's claims to adverse possession of the disputed strip. In reviewing these, we consider whether the trial court's judgment properly follows from its unchallenged findings, together with the challenged findings supported by substantial evidence in the record. We first address Uphoff's adverse possession claim, then Severson's.

1. Uphoff's Adverse Possession Claim

The Clinefelters contend that the trial court erred in concluding that Uphoff and their predecessors in interest used the disputed strip continuously for the required 10-year period. The Clinefelters claim that the trial court erred in tacking on the Hubbards' uses of the parcel to Uphoff's period of adverse possession. The Clinefelters argue that, because the Hubbards signed the 1983 stipulation recognizing the Thompson estate's title to the west half of Swan Street, principles of estoppel preclude any claim of adverse possession based on the Hubbards' uses. Uphoff and Severson concede that the trial court erred in tacking on the Hubbards' period of

possession, but maintain that the uses of the subsequent owners, combined with Uphoff's own uses, still establish 10 years of adverse possession.

We decline to accept the concession, and we hold that the Hubbard's uses may be considered in judging Uphoff's adverse possession claim. Under the authorities discussed above in Part I. A., the stipulation recognizing the Thompson estate's interest in Swan Street bound the Hubbards as parties to the 1983 litigation. The stipulation, as noted above, set out that the Thompson estate (the Clinefelters' predecessor) owned the western half of Swan Street adjacent to the Hubbards' property and that the Hubbards owned the eastern half. The stipulation also granted each party a permanent easement for drainage, ingress, egress and utilities over the other party's half of Swan Street, but prohibited use of the other party's half for "parking or storage or in any other manner not reasonably related to the exercise of the parties' rights to drainage, ingress, egress and utilities." CP at 10. Whatever the effect of any potential estoppel, the Hubbards were not authorized to put in a garden in the disputed strip. By doing so, they engaged in a use that was adverse to the Thompson estate under the criteria for adverse possession in Part II. B of the Analysis, above. The Clinefelters are in privity with the Thompson estate, and Uphoff is in privity with the Hubbards. Therefore, under *Roy*, 46 Wn. App. at 413, the Hubbards' garden use may be tacked to successive periods of occupation to compute the required 10-year period of adverse holding. In addition, as shown below, Hubbards' garden meets the requirements for adverse possession.

In conclusion of law 7, the trial court held that by tacking the uses and occupations of their predecessors Hubbard, Kronquist, and Myers, Uphoff had adversely possessed the disputed strip adjacent to their property from 1977 to 2011,

by installing and maintaining gardens, a greenhouse, chicken coops, grading and maintaining a driveway which only they used, parked vehicles and other indicia of ownership.

CP at 66. Finding of fact 9 states:

Florence Hubbard testified that when Ted Thompson sold the current Uphoff/Burnell property to her in 1977, she treated the old fence in platted Swan Street as the common boundary between her property and Ted Thompson's property, including building a greenhouse and installing a garden adjacent to the fence.

CP at 63. Although phrased in terms of a finding about Florence Hubbard's testimony, finding 9, reasonably read, serves as a finding that Hubbard installed a garden in the disputed strip when the Hubbards bought the property in 1977. In addition, conclusion 7, holds that the Hubbards' use was one of the adverse uses that may be tacked onto the other uses to reach the 10-year period.

The Clinefelters challenge this determination as not adequately showing continuous use. As shown, however, substantial evidence is present to support Florence Hubbard's garden use from 1977 to 1990. That alone shows a use continuous enough to establish adverse possession. As also shown, substantial evidence supports a finding that Kronquist and the Myers continued to maintain Hubbard's garden in the disputed strip. Thus, without even considering Uphoff's uses, the evidence shows continuous, adverse use of the garden for a period of approximately 25 years. For this reason, the trial court was correct in quieting title in Uphoff.

2. Severson's Adverse Possession Claim

The Clinefelters also contend that Severson failed to show that his claimed adverse possession of the portion of the disputed strip adjacent to his parcel was exclusive or hostile. We disagree.

a. Hostility

As already noted, Severson's subjective belief that the Clinefelters or their predecessors in interest had legal title to the disputed area is irrelevant to whether his use was hostile for purposes of adverse possession: instead, "[t]he nature of his possession will be determined solely on the basis of the manner in which he treats the property." *Chaplin*, 100 Wn.2d at 860-61.

"[P]ermission, express or implied, from the true owner negates the hostility element as a matter of law," unless the claimant shows "that the permission terminated and that the original owner had notice of the adverse use." *Teel*, 155 Wn. App. at 396. In addition, "an initial presumption of permissive use" applies in "enclosed or developed land cases in which there is a reasonable inference of neighborly sufferance or acquiescence." *Gamboa*, 183 Wn.2d at 47. No such presumption applies here, however, because the evidence does not give rise to a reasonable inference that Thompson or the Clinefelters acceded to Severson's uses of the disputed strip out of neighborly sufferance or acquiescence.

In *Gamboa*, 183 Wn.2d at 47, as in the case on which it largely relied, *Roediger v. Cullen*, 26 Wn.2d 690, 712-14, 175 P.2d 669 (1946), the neighbors' long period of common use of the subsequently disputed routes gave rise to the inference of neighborly accommodation. Here, Thompson and Clinefelter only used the disputed strip occasionally as a foot path, while Severson mowed it and used the disputed strip as though it were his own property. The trial court did not err in concluding that Severson's possession of the strip was legally hostile to the Clinefelters.

b. Exclusivity

The Clinefelters argue that Severson cannot meet the exclusivity requirement because both the Clinefelters and Thompson occasionally walked in the strip. This, however, does not necessarily defeat Severson's adverse possession claim. As noted above, "[a]n occasional, transitory use by the true owner" does not defeat exclusivity "if the uses the adverse possessor permits are such as a true owner would permit a third person to do as a neighborly accommodation." *Lilly*, 88 Wn. App. at 313. We have held that "slight and occasional use" by the title owner did not render the adverse possessor's use insufficiently exclusive to support the claim where the adverse possessor's use "differed fundamentally in scope and substance from the use made by the" title owner. *Crites*, 49 Wn. App. at 174-75.

The record here shows that Severson used the area more or less as he would have his own backyard, regularly mowing and at times storing his boat there. On the other hand, Hubbard testified only that "there were times that [Thompson] did come through" the old fence into the disputed strip, 1 VRP at 118, and the Clinefelters admittedly walked through it only "periodically." 2 VRP at 46. Given the nature of the property at issue and the apparently friendly relations that prevailed in the neighborhood prior to the Olson survey and this lawsuit, this is the type of occasional, transitory use that a true owner would have allowed as a neighborly accommodation. The trial court did not err in ruling that Severson's use of the disputed strip was sufficiently exclusive to the true owners' rights to support his adverse possession claim.

III. ATTORNEY FEES

Uphoff and Severson request costs and attorney fees on appeal. However, they do not identify what provision of law entitles them to an award or devote a section of their opening brief to the request, as RAP 18.1 requires. We thus decline to consider their requests.

CONCLUSION

We hold that the 1983 stipulation is not binding on Severson or Uphoff and that the evidence establishes adverse possession by Severson and by Uphoff's predecessors under the applicable legal principles. Therefore, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
BJORGEN, A.C.J.

We concur:

_____
LEE, J.

_____
SUTTON, J.